IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| BRIAN C. SIMS,<br><br>        Plaintiff,<br><br>  v.<br><br>VC999 PACKAGING SYSTEMS, et al.,<br><br>        Defendants. | Civil No. 17-2636 (RMB/KMW)<br><br>**OPINION** |

**RENÉE MARIE BUMB, District Judge**

I. INTRODUCTION

This matter comes before the Court on the Motion for Summary Judgment brought by Defendant Express Scripts, Inc. [Docket No. 209]. For the reasons set forth below, the Court will deny the motion.

II. BACKGROUND[1]

This suit stems from a workplace accident that resulted in the below-the-elbow amputation of Plaintiff Brian C. Sims' left

---

[1] The Court presents the below version of facts, some of which are disputed, in the light most favorable to Mr. Sims, because he is the party opposing summary judgment. See generally L. Civ. R. 56.1(a).

arm. At the time of the accident, Mr. Sims was employed by Express Scripts, Inc. ("ESI"), a national mail-order pharmacy that fills, packages, and distributes prescriptions. Mr. Sims worked as an electromechanical technician ("EMT") and his duties included maintaining, servicing, and repairing large industrial machines at the ESI facility in Florence, New Jersey. The accident in question occurred on August 24, 2015, while Mr. Sims was servicing a machine called the Wrap Seal 8. Although Mr. Sims has received over $1 million in workers' compensation benefits since the accident, he seeks to hold ESI also liable for this accident under the "intentional wrong" exception under the Workers' Compensation Act, described below. In that regard, Mr. Sims claims that ESI is liable because of its policies, modifications of a particular safety feature, and handling of OSHA's post-accident investigation. These issues are discussed in turn below.

### A. Wrap Seal 8 and the Accident

Briefly, the Wrap Seal 8 is an industrial machine that is used to prepare mail-order prescriptions for delivery. The Wrap Seal 8 is made up of several component parts, some of which were designed and manufactured by co-defendants VC999 Packaging Systems ("VC999") and Eagle Technologies Group ("Eagle"). At the time of the accident, Mr. Sims was working on a portion of the Wrap Seal 8 that is comprised of a top and bottom die (or plate), both of which were heated to approximately 250 degrees Fahrenheit. When

activated, the two die would come together to heat pieces of plastic used to package prescriptions. Conversely, when the Wrap Seal 8 was not in use, there was some distance between the two die, such that Mr. Sims could fit his arm between them and attempt to make repairs. This is what Mr. Sims was doing at the time of the accident. However, while Mr. Sims' arm was between the die, his coworker Robert Nolthenius activated the Wrap Seal 8, causing the die to come together. This trapped Mr. Sims' arm between the two 250-degree dies, causing severe burns and crushing injuries that ultimately resulted in the below-the-elbow amputation of Mr. Sims' left arm.

### B. Lock Out, Tag Out Policy

Mr. Sims admits that the Wrap Seal 8 is equipped with multiple safety features that, if utilized properly, could have prevented this accident. Particularly relevant to this motion is the Wrap Seal 8's "Lock Out, Tag Out" ("LOTO") feature, as well as what the parties refer to as Safety Guard #2. LOTO is a safety procedure by which machine maintenance workers can turn off a machine before commencing a repair and insert a personalized padlock to physically prevent anyone from turning the machine back on. Mr. Sims admits that had he used LOTO, the accident would not have occurred. However, Mr. Sims and two other EMTs each testified that ESI had an unwritten policy to avoid using LOTO because it would require the machine to be shut down for upwards of 45 minutes, which

negatively affected productivity. Mr. Sims presents evidence that at least one EMT had expressed concern to ESI about the lack of LOTO usage, but ESI did not address these concerns until after the accident.

**C. Safety Guard #2 Modification**

Safety Guard #2 is an interlocked safety guard on the Wrap Seal 8, located in the general area where Mr. Sims was working at the time of the accident.[2] By design, when the safety cover is removed, electricity to the machine is cut off. This is because the interlock mechanism works via two magnets, one installed on the machine and one installed on the safety guard. When the guard is removed from the machine such that the magnetic force is broken, the electricity to the system is interrupted.

In early 2014, ESI set out to modify certain aspects of the Wrap Seal 8, which Mr. Sims alleges stemmed from an effort to increase productivity. This modification in turn required the removal, modification, and, in theory, replacement of Safety Guard #2 with a modified version of it. VC999, which manufactured the unmodified version of Safety Guard #2, indicated to ESI that it would not be held responsible for the ramifications of such a modification: "[I]f ESI cuts the guards down after installation, ESI will have to assume the safety responsibility." [Docket No.

---

[2] Safety Guard #1, which was fully functional, was also in the general area where Mr. Sims was working.

4

223-4, Exh. G.] Because VC999 would not do the modification for ESI, ESI ultimately contracted Eagle to do it, which Eagle then assigned to non-party Brennan Industrial. Some months before the accident, Safety Guard #2 was removed, presumably by Brennan Industrial. However, at the time of the accident, it had not been replaced. Instead, a piece of tape had been placed over the interlocking magnets, bypassing the safety feature and ensuring that the machine would operate in Safety Guard #2's absence.

ESI claims that it did not place the tape over the magnets and that it did not even know Safety Guard #2 was never replaced. However, ESI does not dispute that the modification — whether done successfully and to completion or not — was done at ESI's direction. Moreover, ESI admits that the modified Safety Guard #2 was in its possession; soon after the accident occurred, ESI installed the modified version. Mr. Sims alleges that, had Safety Guard #2 been in place, he would have noticed it (as opposed to the tape) and deactivated the Wrap Seal 8 by removing it before the accident occurred. All parties agree that, in that scenario, the accident would have been avoided.

**D. OSHA Investigation**

OSHA investigated the accident soon after its occurrence. ESI admits that by the time of this investigation, Safety Guard #2 had been replaced with the modification. All photographs that ESI provided to OSHA depicted the Wrap Seal 8 in its post-accident

5

condition with the modified Safety Guard #2, as opposed to in the condition that existed at the time of the accident, that is, the absence of Safety Guard #2. ESI did not provide the videos of the accident to OSHA. Finally, ESI did not at any point disclose to OSHA that Safety Guard #2 was not in place at the time of the accident.

## III. STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" only if it might impact the "outcome of the suit under the governing law." Gonzalez v. Sec'y of Dep't of Homeland Sec., 678 F.3d 254, 261 (3d Cir. 2012). A dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party. Id. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marion v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

The movant "bears the initial responsibility of informing the

6

district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any,' which it believes to demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56). Once the movant has met that burden, the nonmoving party "must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Cooper v. Sniezek, 418 F. App'x 56, 58 (3d Cir. 2011) (quoting Celotex, 477 U.S. at 322).

**B. Intentional Wrong**

The New Jersey Workers' Compensation Act (the "Act") represents an implicit quid pro quo agreement between employers and employees. See N.J. STAT. ANN. § 34:15-1 et seq.; Millison v. E.I. Du Pont de Nemours & Co., 501 A.2d 505, 512 (1985). The Act constitutes a "trade-off whereby employees relinquish[] their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffer[] injuries by accident arising out of and in the course of employment." Millison, 501 A.2d, at 512; see N.J. STAT. ANN. § 34:15-8.

However, the relinquishment of the right to sue is not absolute:

> If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, <u>except for intentional wrong</u>.

N.J. S<small>TAT</small>. A<small>NN</small>. § 34:15-8 (emphasis added). The New Jersey Supreme Court has created a two-prong test to determine whether or not an employer's conduct constitutes an "intentional wrong." See <u>Laidlow v. Hariton Machinery Co., Inc.</u>, 790 A.2d 884, 894 (N.J. 2002) (citing <u>Millison</u>, 501 A.2d 505). Namely,

> (1) the employer must know that [its] actions are substantially certain to result in injury or death to the employee, and (2) the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize.

<u>Id.</u>

In deciding a summary judgment motion on the issue of the intentional wrong exception to the Act, "the trial court must make two separate inquiries." <u>Id.</u> at 898. First, it must ask whether a jury, when viewing the evidence in the light most favorable to the employee, could conclude that the first prong, known as the "conduct prong," has been satisfied. <u>Id.</u> If the court answers that question affirmatively, then the court must determine whether the second prong, known as the "context prong," has been satisfied. <u>Id.</u> "Resolving whether the context prong . . . is met is solely a judicial function." <u>Id.</u> In other words, "if the substantial

8

certainty standard presents a jury question and if the court concludes that the employee's allegations, if proved, would meet the context prong, the employer's motion for summary judgment should be denied; if not, it should be granted." Id.

**IV. ANALYSIS**

ESI makes four main arguments in its motion for summary judgment. The first is that ESI never committed an "intentional act" at all. The second is that no reasonable jury could find that Mr. Sims' allegations satisfy the conduct prong outlined above. The third is that, as a matter of law, the context prong cannot be satisfied. Finally, the fourth is that the actions taken by ESI were not the proximate cause of Mr. Sims' injury. The Court is not persuaded by any of those arguments.

**A. Intentional Act**

First, there is a genuine issue of material fact as to whether ESI committed an intentional act or not. ESI first argues that ESI itself never removed or failed to replace Safety Guard #2; Brennan Industrial did. This cat's paw defense is unavailing.[3] Brennan

---

[3] "The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by [Judge Richard] Posner in 1990. In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." Staub v. Proctor Hosp., 562 U.S. 411, 415 n.1 (2011) (citation omitted); see also

Industrial only acted at the direction of ESI, via Eagle Technologies. The Court will not, as a matter of law, absolve ESI of any responsibility for those instructions simply because ESI did not carry out the physical work itself. Additionally, ESI attempts to argue that there is simply no evidence that ESI had an unwritten policy against EMTs using the LOTO safety procedure. To the contrary, Mr. Sims has presented testimony from three EMTs that suggests just that type of unwritten policy. In short, there are genuine issues of fact as to ESI's LOTO policy and ESI's role in the removal of Safety Guard #2. A jury, not this Court, shall decide whether those acts are sufficient to establish intentional acts for the purposes of the law at issue.

**B.    Conduct Prong**

Second, a reasonable jury could find that the facts of this case are exactly as laid out above. That is to say a reasonable jury could conclude that (1) ESI had an unwritten policy against EMTs using LOTO; (2) ESI wanted to remove Safety Guard #2 in order to increase production; (3) ESI knew that VC999 would not take responsibility for the safety risks that came with modifying Safety Guard #2; (4) ESI had Safety Guard #2 removed and failed to replace it; (5) ESI either taped over or had Brennan Industrial tape over

---

Lowe v. Medco Health Solutions of Willingboro, LLC, Civil No. 10-4823 (RMB/AMD), 2012 U.S. Dist. LEXIS 59137, at *44-49, 45 n.16 (D.N.J. Apr. 27, 2012).

10

the magnetic strip of Safety Guard #2 to bypass the safety mechanism; and (6) ESI deliberately misled OSHA during its post-accident investigation by withholding information about Safety Guard #2's status at the time of the accident. That is sufficient to satisfy the conduct prong.

In Laidlow v. Hariton Machinery Company, Inc., the New Jersey Supreme Court was faced with a similar set of facts as exist in this case. 790 A.2d 884 (N.J. 2002). Rudolph Laidlow, an employee at a manufacturing company, was injured while using a machine called a rolling mill. Id. at 887. His employer had purchased a safety guard to protect against such an injury, but purposefully disengaged it prior to Mr. Laidlow's injury. Id. at 887-88. Mr. Laidlow alleged that the guard was only ever in place when OSHA inspectors came to the plant. Id. at 888. Prior to Mr. Laidlow's injury, employees had multiple "close calls," which the employer was aware of, but despite employees' protestations, the employer refused to replace the guard. Id. The employer admitted to having done this for "speed and convenience." Id. Ultimately, the Supreme Court of New Jersey held that

> a reasonable jury could conclude, in light of all
> surrounding circumstances, including the prior close-
> calls, the seriousness of any potential injury that
> could occur, Laidlow's complaints about the absent
> guard, and the guilty knowledge of [the employer] as
> revealed by its deliberate and systematic deception of
> OSHA, that [the employer] knew that it was substantially
> certain that removal of the safety guard would result
> eventually in injury to one of its employees.

Id. at 897-98.

While the circumstances are not exactly the same in this case as they were in Laidlow, they do not need to be for a jury to conclude that the conduct prong is satisfied. As the Laidlow court wrote, "To be sure, reports of prior accidents like prior 'close-calls' are evidence of an employer's knowledge that death or injury are substantially certain to result, but they are not the only such evidence." Id. at 897 (emphasis added). The facts in this case, when considered in the light most favorable to Mr. Sims, are sufficient to create a jury question as to whether the conduct prong is satisfied. It is not for the Court to decide that factual question at this stage. As a result, summary judgment cannot be granted in ESI's favor on that basis.

### C. Context Prong

The Laidlow court then analyzed the context prong of the Millison standard. The court held that

> if an employee is injured when an employer deliberately removes a safety device from a dangerous machine to enhance profit or production, with substantial certainty that it will result in death or injury to a worker, and also deliberately and systematically deceives OSHA into believing that the machine is guarded, we are convinced that the Legislature would never consider such actions or injury to constitute simple facts of industrial life. On the contrary, such conduct violates the social contract so thoroughly that we are confident that the Legislature would never expect it to fall within the Worker's Compensation bar.

Id. at 898. The court was careful to note that it was not creating

"a per se rule that an employer's conduct equates with an 'intentional wrong' within the meaning of [N.J. STAT. ANN.] § 34:15-8 whenever that employer removes a guard or similar safety device from equipment or machinery, or commits some other OSHA violation." Id. Instead, courts shall ground their decisions on the context prong "in the totality of the facts contained in the record and the satisfaction of the standards established in Millison" and Laidlow. Id.

This Court finds that the circumstances of this case, if proven by Mr. Sims, meet the high standard of the Millison context prong. At trial, Mr. Sims will seek to prove that ESI knew about the dangers of removing Safety Guard #2, had it removed, taped over it, and misled OSHA about it, all while ignoring employee complaints about an unwritten policy against using LOTO. If these facts are proven, this Court is "convinced that the Legislature would never consider such actions or injury to constitute simple facts of industrial life." See id. Like the conduct alleged in Laidlow, the conduct alleged here, if proven, "violates the social contract so thoroughly that [this Court is] confident that the Legislature would never expect it to fall within the Worker's Compensation bar." See id.

To be clear, the Court notes that "the proofs at trial may not track the employee's allegations" in this motion. See id. In other words, the allegations that the Court is relying on to deny

13

ESI's motion for summary judgment might not be proven at trial. Nevertheless, a jury could still find the conduct prong to be satisfied by whatever facts are proven at trial. The Laidlow court, with that reality in mind, stressed the importance that "the court should secure from the jury a resolution of those conflicts by way of a carefully crafted jury verdict form." Id. This Court appreciates that need and will act accordingly at trial. But, for the purposes of this motion and considering the evidence in the light most favorable to Mr. Sims, the Court finds that the context prong has been satisfied here. Thus, ESI's motion for summary judgment will not be granted on that basis.

### D. Proximate Causation

Finally, ESI argues that it is entitled to summary judgment because its actions were not the proximate cause of Mr. Sims' injuries. As above, the Court is convinced that this constitutes a genuine issue of material fact. Mr. Sims claims that he would have utilized LOTO if not for ESI's alleged policy against it and that he would have removed Safety Guard #2 if it had not been taped over. Either of those actions would have prevented the accident from occurring as it occurred. ESI claims that Mr. Sims' "testimony is nothing more than an attempt at revisionist speculation." [Docket No. 209-3, at 33.] That is precisely the type of factual question that falls within the province of the jury, and not the Court. Therefore, the issue of proximate cause cannot be the basis

for granting summary judgment in favor of ESI.

## V.     CONCLUSION

For the reasons set forth above, the Court will deny ESI's motion for summary judgment. An accompanying Order shall issue.

March 11, 2020                                s/Renée Marie Bumb
Date                                          RENÉE MARIE BUMB